194 N.J. Super. 435 (1984)
477 A.2d 363
STATE OF NEW JERSEY, DEPARTMENT OF HEALTH, PETITIONER-RESPONDENT,
v.
LEAH G. TEGNAZIAN, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 20, 1984.
Decided May 11, 1984.
*438 Before Judges ANTELL, JOELSON and McELROY.
John P. Palmisano, argued the cause for appellant (Andora, Palmisano, De Cotiis & Harris, attorneys; John P. Palmisano on the brief).
Vincent J. Rizzo, Jr., Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; James J. Ciancia, Assistant Attorney General, of counsel and Vincent J. Rizzo, Jr., on the brief).
The Opinion of the Court was Delivered by, ANTELL, P.J.A.D.
This is an appeal from a final decision and order of the State Commissioner of Health ("Commissioner") filed May 27, 1983 revoking respondent's license as a nursing home administrator. The proceedings were begun on a complaint filed by the Nursing Home Administrator's Licensing Board ("Licensing Board") in August 1981 alleging misconduct by respondent as administrator of the Armenian Home for the Aged. The complaint was amended, and hearings were commenced in October 1982, continuing on different days thereafter before an administrative law judge ("ALJ"). The record was closed February 14, 1983 and the ALJ's initial report and recommendation was filed *439 March 31, 1983. In substance, the charges against respondent were that she had (1) upbraided certain residents in a loud and angry voice, (2) physically abused certain residents, (3) invaded the privacy of certain residents, (4) locked one of the residents in a room, thereby endangering her safety, and (5) solicited an employee to sign as witness to a will whose execution she had not actually observed.
In his initial decision the ALJ recommended dismissal of all charges except the last, as to which he recommended a minor reprimand. In recommending dismissal of the other charges, he commented that the entire case, with the one exception, "amounted in large measure to a waste of the State's and the respondent's time and money," and that "any suspension or revocation of the respondent's license is clearly out of the question." The ALJ's report was thereupon referred to the Licensing Board for review, and on May 19, 1983 that body by resolution voted unanimously to recommend, consistent with the complaint it had filed, that respondent's license should be revoked. The resolution further noted that the Licensing Board took "strong exception" to the ALJ's opinion that the case was a waste of the State's time and to his view that suspension or revocation was clearly out of the question.
The Licensing Board's resolution was forwarded to the Commissioner who thereupon prepared and filed the decision and order before us for review. Although he concurred with the ALJ that many of the charges against respondent had not been supported by the evidence, he concluded that the five charges under consideration had been proved and rejected the ALJ's findings and conclusions to the contrary. Concluding that respondent's actions were "reprehensible under standards of professional conduct" he approvingly noted the Licensing Board's opinion that the ALJ had shown "a disturbing insensitivity to the dignity and welfare of the nursing home patients," and opined that it was "particularly offensive to excuse many instances of patient abuse, as the Administrative Law Judge has done, because the patients are Armenian." Elsewhere in *440 his decision he stated that the incidents of verbal and physical abuse had been conceded by the ALJ but that he "excused the instances as simply `animated' conduct typical of Armenians." The Commissioner then commented that neither he nor the members of the Licensing Board "accept that characterization as being fair to Armenians, fair to the patients or fair to the corps of professionals in this field...." He concluded with the observation that the ALJ had "glossed over serious abuses of the patients' rights and patients' welfare by Ms. Tegnazian, which cannot in good conscience be disregarded."
Before proceeding to the merits it is necessary to deal with a preliminary matter.
We remind the ALJ and the Commissioner that they are not rivals, but co-participants in a system of administrative justice which requires them to adjudicate controversies fraught with the gravest consequences to the adversaries who appear before them. It contemplates that the technical expertise of the administrative agency and the factfinding skills of the ALJ will harmonize to advance the common goal of securing in each individual case the highest and most sophisticated order of balanced professional judgment that special knowledge and training can provide. While it is not expected that their respective views will always coincide, it is essential that each recognize the limits of their different perspectives and give respectful deference to the role and authority of the other. We are here to judge cases, not one another. This is a demanding process in which caustic or recriminatory comments can play no part other than as distractions from the legally operative facts. Moreover, the exchange of reproachful and derogatory comments between governmental officials exercising judicial and quasi-judicial powers is demeaning to the appearance of justice. It is rich with the suggestion that the licensee who has been the subject of disciplinary action has simply fallen victim to bureaucratic strife and has been penalized for reasons having nothing to do with the merits of the proceeding.
*441 In commenting as he did that the case was a waste of time and money, the ALJ improperly exceeded his authority which was limited to the making of objective and dispassionate recommended findings and conclusions for evaluation by the agency. By so doing he improperly drew into question the integrity and competence of a governmental body which had presumably acted in the conscientious discharge of a duty confided to its exclusive judgment. As is evident, the ALJ's action could only have been counterproductive to his own intent and inimical to an objective disposition of the charges since the Licensing Board could thereafter recommend to the Commissioner acceptance of the ALJ's recommendations only by endorsing his implication that the proceeding, which the Licensing Board had itself initiated, had been irresponsibly brought.
Equally inappropriate was the Commissioner's allusion to what he termed the ALJ's "disturbing insensitivity to the dignity and welfare of the nursing home patients." The "sensitivity" factor is one which properly falls within the province of agency expertise and it is naturally to be expected that the agency would be more sensitively attuned to the requirements of the patients than the ALJ. If the Commissioner's responses to the evidence differed from those of the ALJ he was at liberty to demonstrate this, as he did, by reaching his own independent conclusions. However, it was improper for him to impugn directly those of the ALJ.
With respect to the Commissioner's characterization of the ALJ's decision as an expression of ethnic bias, this was grounded in his misconception of a fact-finding methodology followed by the ALJ which was beyond reproach. One of the charges against respondent was that she shouted at the patients in an angry and abusive manner. In the portion of the ALJ's decision from which the Commissioner inferred an anti-Armenian prejudice the ALJ, in analyzing the testimony concerning such incidents, simply noted that certain of the witnesses

*442 readily conceded that in addition to their not understanding the Armenian language it also was quite true that persons of Armenian descent do have a tendency to speak to one another in "animated" tones and, given the fact that many of the residents of the Home were hard of hearing, it was to be expected that voices would be raised in communicating with them.
The statement was made in the course of reviewing the testimony and it is obvious to us that the ALJ did nothing more than note the possibility that the witnesses, who were strangers to the Armenian language, mistook what they themselves perceived as an "animated" manner of expression characteristic of Armenian speech for angry verbal abuse. To moralize from this, as the Commissioner did, that "[w]hatever their ethnic background may be, the patients are rightfully entitled to humane, professionally temperate care and supervision," and to say that it was "particularly offensive to excuse many instances of patient abuse, as the Administrative Law Judge has done, because the patients are Armenian" was without the slightest justification. Because the Commissioner so completely misapprehended the import of the ALJ's comment, and because of his repeatedly expressed preoccupation with the mistaken belief that the initial decision was tainted by a vicious bias, we would be obliged to vacate his order of revocation quite independently of other defects in the proceedings under review to which we now turn.
N.J.S.A. 52:14B-10(d) provides that a final decision of an administrative agency in a contested case
shall include findings of fact and conclusions of law, separately stated and shall be based only upon the evidence of record at the hearing....
Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings. The final decision may incorporate by reference any or all of the recommendations of the administrative law judge.
Paragraph (c) of the same section obliges the ALJ assigned to conduct hearings in a contested case to file a recommended report and decision with recommended findings of fact and conclusions of law with the state agency "in such form that it may be adopted as the decision in the case." Thus, the ultimate determination of the agency and the ALJ's recommendations *443 must be accompanied by basic findings of fact sufficient to support them. The requirement of such findings is not a technicality but is a matter of substance. Its purpose is to enable a reviewing court to conduct an intelligent review of the administrative decision and determine if the facts upon which the order is grounded afford a reasonable basis therefor. Talocci v. Strelecki, 93 N.J. Super. 567, 572 (App.Div. 1967).
In Application of Howard Savings Institution of Newark, 32 N.J. 29, 52 (1960) the Supreme Court stated:
It is axiomatic in this State by this time that an administrative agency acting quasi-judicially must set forth basic findings of fact, supported by the evidence and supporting the ultimate conclusions and final determination, for the salutary purpose of informing the interested parties and any reviewing tribunal of the basis on which the final decision was reached so that it may be readily determined whether the result is sufficiently and soundly grounded or derives from arbitrary, capricious or extra-legal considerations.
Three additional practical considerations for making findings of fact are: to prevent judicial usurpation of administrative functions, to help parties plan their cases for rehearing and for judicial review, and to keep administrative agencies within their jurisdiction. Mackler v. Bd. of Education of City of Camden, 16 N.J. 362, 370 (1954). Further, quasi-judicial administrative decisions must set forth "an `analytical expression of the basis which, applied to the found facts, led to the holdings below.'" Smith v. E.T.L. Enterprises, 155 N.J. Super. 343, 348 (App.Div. 1978), quoting Benjamin Moore & Co. v. Newark, 133 N.J. Super. 427, 428 (App.Div. 1975).
Our role as an appellate court sitting in review of factual determinations made by administrative bodies is to determine "`whether the findings made could reasonably have been reached on sufficient credible evidence present in the record,' considering `the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility...." Close v. Kordulak Bros., 44 N.J. 589, 599 (1965). See, also, Mayflower Securities v. Bureau of Securities, 64 N.J. 85, 92-93 (1973).
*444 The Commissioner's findings to the extent here material are set forth in the following language:

Finding No. 3  There is insufficient evidence that during the period of suspension of her license Ms. Tegnazian acted in violation of the terms and conditions of the suspension.

Finding No. 4  During her service as administrator of the Armenian Home for the Aged the respondent raised her voice with respect to conversations with patients and staff. There are innumerable references throughout the testimony, too numerous to discount, to support the additional finding that she also berated patients in a loud and angry tone of voice, using English as well as Armenian, employing profanities and calling them pigs, snakes, sneaks, cobras, lousy, rotten and crazy. On many occasions Ms. Tegnazian screamed at them in enraged tones. Ms. Tegnazian herself admitted demonstrating her anger towards certain patients while in their presence and further admitted referring to them by using four letter words and other expletives while in the presence of office personnel. Such verbal abuse of patients by a professional administrator is intolerable.

Finding No. 5  From the testimony of staff members who actually observed the incidents, I find that Ms. Tegnazian physically abused two residents of the nursing home. On once [sic] occasion, she pushed resident (M.M.) into her office and screamed at her in English to sit still in a chair; the resident became upset and began to cry. On another occasion Ms. Tegnazian tried to remove a resident (A.P.) from her office by pushing her across the room at least two times over a distance of approximately 10 feet.

Finding No. 6  Ms. Tegnazian violated the privacy of residents of the nursing home in several respects. She opened their personal mail and threw it into the waste basket, stating in essence that they would not miss it. The administrator has no right or power to withhold mail from the residents any more than the Postmaster General can refuse to provide for delivery of the mail. Direct receipt of mail is an express guarantee of the Nursing Home Patients' Bill of Rights, N.J.S.A. 30:13-5(d). The administrator cannot interfere with this right by substituting her judgment for that of the patients.
Ms. Tegnazian also gave instructions in English to staff to eavesdrop on conversations of the residents and to ask them questions while she eavesdropped on their conversation. These actions are far different from a mere overhearing of comments. They are a deliberate invasion of the right of residents to enjoy free conversation with persons of their own choice.

Finding No. 7  In other respects Ms. Tegnazian did conduct herself in a highly improper manner. She admitted that she specifically directed the locking of the door to a room occupied by a 90-year old patient and corroborating evidence indicates that this occurred more than once. This made it impossible for the patient to gain ready exit from the room, and the patient was forced to use a long hallway and double staircase to get to any other part of the building. The lack of easy exit for this aged patient unquestionably presented a safety hazard, and an especially serious one in the event of an emergency. Ms. Tegnazian's indifference to this patient's safety and welfare is unconscionable.

*445 Finding No. 8  The conduct described in findings number 4, 5, 6, 7 and 9 constitute acts of misconduct and dereliction of professional responsibilities in violation of N.J.A.C. 8:34-1.18(a)(7) and (17).

Finding No. 9  On one occasion respondent did attempt to solicit an employee to sign a will as a witness even though the employee did not actually see the testator execute the same. That conduct was much more than merely a mistake in judgment. A nursing home administrator who works with aged patients must be held to familiarity with the requirements for wills, since such matters are ordinarily considered by the elderly. If, indeed, she did not know that a witness must actually a testator's signature, she sensibly should have known that. There is no acceptable excuse for this error in judgment on the part of a professional administrator.
While under other circumstances the Commissioner's findings might be adjudged satisfactory, the form in which they are presented leaves us in doubt whether he considered all the evidence bearing on the events dealt with and the surrounding explanatory circumstances. As we will shortly show, the occurrences themselves were largely undisputed; what was in controversy was the question of why they happened, what led up to them, and whether respondent's conduct went beyond the reasonable and necessary exercise of authority to the point of patient abuse. Furthermore, finding 4, as we will discuss more fully hereinafter, to the effect that respondent directly addressed residents with profanities and epithets is not supported by the record.
The ALJ's findings were in part presented within a narrative discussion and in part within categorical numbered paragraphs. In his discussion he described respondent as a person who does not hesitate to exercise authority and whose methods did create frictions within the nursing home staff. Having earlier noted that the proceeding had been set in motion by the concerted action of dissident employees, it was his view that "a variety of minor incidents have attempted to be elevated to major proportions which place in jeopardy the respondent's very ability to earn a livelihood." He found that although "she may have raised her voice from time to time, and even used certain derogatory terms with respect to residents, by and large, the respondent was shown to have been a loving and caring person who has devoted an inordinate amount of time and attention to *446 the Armenian home." Finally, he found that although she might "sometimes have been short tempered or impatient * * * none of the charges of abuse, oral or physical, either singly or in combination, were supported by proof which rose to a level sufficient for me to determine that by a preponderance of the credible evidence the respondent has shown herself to have acted in such way that she should suffer the loss of her nursing home administrator's license."
His numbered categorical findings relevant to this appeal took the following form:
4. During her service as administrator of the Armenian Home for the Aged the respondent did, from time to time, raise her voice with respect to conversations with patients and staff. However, on no such occasion did she verbally abuse any such patient in a manner which would have jeopardized her continuing to hold a nursing home administrator's license.
5. At no time did the respondent ever physically abuse any resident of the Armenian Home for the Aged.
6. At no time did the respondent ever intrude upon or otherwise act contrary to the privacy of any resident of the Armenian Home for the Aged.
7. At no time did respondent conduct herself in a manner either while she held a nursing home administrator's license, nor during the period of her suspension, which would justify that her license now be suspended, revoked or otherwise imperiled.
8. No conduct engaged in by the respondent violated any provision of N.J.S.A. 26:2H-27, 2H-28 or N.J.A.C. 8:34-1.18(a)(7)(9)(17).
9. On one occasion respondent did attempt to solicit an employee to sign a will as a witness even though that employee did not actually see the testator execute the same. That conduct was merely a mistake in judgment deserving of a minor reprimand only.
It can be seen that the ALJ's purported findings are stated in highly conclusory form and amount to judgments rather than statements of fact. We find this particularly difficult to understand in light of the detailed and carefully prepared proposed findings and conclusions submitted to him by respective counsel. Finding #4, for example, amounts to nothing more than an expression of opinion based on undisclosed facts that although respondent did raise her voice from time to time in addressing the patients, this did not constitute such verbal abuse as to justify revocation of her license. Nowhere does he deal with the extensive evidence bearing on the charge of *447 verbal abuse or set forth his factual findings thereon from which the agency or a reviewing court could determine whether the facts, as the ALJ saw them, merited disciplinary action. Nowhere does he detail surrounding circumstances, the volume and tone of respondent's voice during the incidents in question, whether her tone conveyed rage or authority, its effects upon the residents, the nature of the confrontations, whether the volume of her voice was necessary to communicate with the elderly residents because of their auditory or intellectual infirmities or any other facts relevant for evaluation in resolving the ultimate question of whether violations of acceptable standards of conduct had occurred.
Similarly, we do not have the benefit of findings necessary to support his opinion that respondent at no time physically abused any of the residents. The evidence on this question was highly ambiguous and called upon the ALJ to interpret the testimony and then present the agency with his factual determination of what had actually occurred. The two cases dealt with by the Commissioner in his finding #5 involve two residents, M.M. and A.P. In the case of A.P., the resident in question had come to the business office of the Home, where she was not permitted, and refused to leave when told to do so. From the evidence, it was open to the ALJ to find that only the slightest degree of physical contact had taken place between respondent and the resident, and that no more force was used than was necessary to remove the resident from the room. Although the Commissioner spoke in his decision of patients being "physically shoved about" the evidence before the ALJ authorized the inference, if he chose to draw it, that the resident was simply taken out of the room because she refused to move.
The other claim of physical abuse involved the resident M.M. This elderly person visited the office, as she had many times in the past, with complaints about her teeth. It seems clear that on this occasion respondent reacted with a display of anger, that she pushed M.M. to make her sit down and told her not to move. Respondent stated that although she was angry, her *448 feelings were addressed, not at the resident but at the nursing staff which had failed to deal with the woman's complaint. She testified that she was disturbed by the circumstances of the visit and the fact that M.M. was crying and was at a "desperate stage. That's when they come to me." She testified that she thereupon visited the nursing department to find out why it had not attended to M.M.'s complaint and thereafter she herself made an appointment with the dentist on behalf of M.M. and personally took her for the visit.
As to the testimony that respondent had "pushed" M.M. into a chair, this too required interpretation by the ALJ. According to respondent, this was done not as a form of abuse, but as a necessary exercise of authority to protect the resident from the risks of wandering about unattended in her distracted condition.
None of the foregoing testimony was dealt with by the ALJ in his findings. Nor did he make findings respecting intrusions of patient privacy other than to say that the charge had not been proven. As to the charge of throwing away mail addressed to the residents, respondent denied that she discarded personal mail but acknowledged that from time to time she threw away "junk mail" addressed to the directors. With respect to charges that respondent had deliberately overheard conversations by patients, respondent denied that she ever intentionally eavesdropped. She conceded only that around the time when newspaper articles appeared concerning the suspension of her license she overheard conversations when the subject of the articles was being discussed. The State's evidence was otherwise, and the ALJ was called upon to resolve the conflicting testimony by making appropriate findings.
Also disregarded by the ALJ was the testimony concerning the fact that respondent had locked a ninety year old resident in her room. According to the testimony "a couple of times" respondent had directed that the door be closed and locked during "staff meetings and at other times." The room adjoining the resident's was used for staff meetings and according to *449 respondent the door was kept locked to ensure the privacy of meetings which were being held. Before locking the door the resident was notified in advance of what was happening and was given the option of leaving the room. Furthermore, according to respondent, whenever the resident knocked, the door would be opened and she would be allowed to leave.
On this appeal we review the order and decision of the Commissioner, not the recommended findings and conclusions of the ALJ. Public Advocate Dept. v. Public Utilities Bd., 189 N.J. Super. 491, 507 (App.Div. 1983); New Jersey Bell Telephone Company v. State, 162 N.J. Super. 60, 76-77 (App.Div. 1978). Nevertheless, the Administrative Procedure Act contemplates that the administrative process shall have the benefit of input by a trained fact-finder, and it is evident that respondent is being denied the right to have the ALJ's findings before us when we review the Commissioner's findings to determine if they are supported by substantial credible evidence. That the ALJ's findings must be given such consideration on appeal from the agency's determination is settled. In re Suspension of License of Silberman, 169 N.J. Super. 243, 255-56 (App.Div. 1979), aff'd o.b. 84 N.J. 303 (1980).
As we have noted, the ALJ expressed the view that the case was a waste of time, one in which license revocation was "clearly out of the question." Acting on the same evidence, the Commissioner found respondent's conduct "reprehensible," "highly unprofessional" and despite the ALJ's recommendation ordered that respondent's license be permanently revoked. In no way can we decide whether the agency action is supportable without first finding some explanation for the extraordinary polarity of the foregoing views. Perhaps this results from the application of agency expertise which might have dictated conclusions different from the ALJ's based on the very same facts. Alternatively, the Commissioner may have acted on facts independently found by him and different from those found by the ALJ. There may be other possibilities also, but whatever form the analysis takes it is imperative that both the ALJ and the *450 Commissioner provide us with a statement of the basic facts on which each acted and the principles which each applied. Also required is that we receive from each "`not only an expression of the evidence [they] considered which supports the result, but also some indication of the evidence which was rejected. In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" Stewart v. Sec. of Health, Educ. & Welfare of U.S., 714 F.2d 287, 290 (3rd Cir.1983), quoting Cotter v. Harris, 642 F.2d 700, 705 (3rd Cir.1981).
[U]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." [Gober v. Matthews, 574 F.2d 772, 776 (3rd Cir.1978)].
We add that without such factual treatment a reviewing court is unable to weigh the agency expertise against the ALJ's opportunity to observe the witnesses in deciding whether the agency action is supported by substantial credible evidence.
While the Commissioner is not legally bound to follow the ALJ's recommendations, he may not brush them aside. Indeed, his failure to deal with them in his decision so as to satisfy a reviewing court that they have been seriously studied may spell the difference between agency action which is or is not found to be supported by substantial credible evidence in the record. This is particularly true where factual issues are the focus of attention and questions as to the weight and credibility of evidence must be treated. While the agency is free to formulate its own regulatory policy within the limits of its enabling statute, the word "expertise" does not dispense with the necessity for a reasoned and articulate statement of the basic facts to which agency policy is being applied. Thus, where the documented findings of an ALJ are dismissed without comment by an administrative agency a genuine risk exists that the agency's result may be adjudged factually groundless.
The matter is remanded to the Commissioner of Health with directions to remand immediately to the ALJ for detailed recommended *451 findings of basic facts in support of his expressed conclusions together with a further statement of the reasoning process by which he reaches his result. The ALJ will be directed to file his findings with the State Commissioner of Health within 45 days from the date he receives the remand and the Commissioner is thereafter directed to review the recommended findings and conclusions in accordance with N.J.S.A. 52:14B-10 and file his final decision pursuant to the aforementioned statute in a manner not inconsistent with this option.
We call the Commissioner's attention to his factual finding #4 that in berating patients respondent called them "pigs, snakes, sneaks, cobras, lousy, rotten and crazy." Except for one occasion when she scolded a resident for looking like "a dirty pig" and told him to change his clothes, the testimony nowhere supports the finding that she used these terms in direct address to the patients, although she referred to them in those terms while in the office in the presence of office personnel. Further, the finding that respondent admitted referring to the residents "by using four letter words" is also unsupported by the record. She admitted only that she sometimes used such language, not necessarily referring to the residents, in her office when she was upset.
Reversed and remanded. We do not retain jurisdiction.