**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3323-16T4

IN THE MATTER OF
ODALYS RASTATTER,
CITY OF PASSAIC.

_____

Argued December 10, 2019 – Decided August 17, 2020

Before Judges Accurso, Gilson and Rose.

On appeal from the New Jersey Civil Service Commission, Docket No. 2017-2143.

Matthew A. Peluso argued the cause for appellant Odalys Rastatter.

Philip Gary George argued the cause for respondent City of Passaic (Eric Martin Bernstein, of counsel and on the brief; Philip Gary George, on the brief).

Pamela N. Ullman, Deputy Attorney General, argued the cause for respondent Civil Service Commission (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Pamela N. Ullman, on the brief).

PER CURIAM

Odalys Rastatter appeals from a final decision of the Civil Service Commission rejecting an Administrative Law Judge's decision that recommended overturning the City of Passaic's decision to remove her as a police lieutenant. After review of the record, we agree with the Commission that the ALJ's factual findings were arbitrary and not supported by sufficient, competent and credible evidence in the record. Because the Commission's findings are supported by such evidence, we affirm its decision upholding Rastatter's removal.

The City of Passaic removed Rastatter from her position effective December 7, 2012, for having been absent without leave during Superstorm Sandy, lying to her supervisor and internal affairs about her whereabouts, directing a subordinate to falsify her time records, and failing to supervise the officers and civilians under her command. Rastatter challenged the decision, which was referred to the Office of Administrative Law for a hearing. That hearing was conducted over the course of seven days during October and November 2014 and March 2015. A total of ten witnesses testified, including Rastatter, her supervisor Deputy Chief Paz, Officer Pagan, the subordinate she asked to falsely complete her attendance records, and the detective who interviewed her for the internal affairs investigation.

2

Although the record is extensive, consisting of twelve volumes of transcripts, the issues in dispute are narrow as they revolve around Rastatter's conduct over the course of three days and her statements about it to her commanding officer and internal affairs. In October 2012, Rastatter was the lieutenant in charge of the records and technical services division of the City's police department. On Saturday, October 27, the Governor declared a state of emergency in anticipation of Sandy's landfall. On Sunday, the 28th, Deputy Chief Paz contacted Rastatter by telephone to advise her that the civilian employees in her division would not be expected at work on Monday, but that all sworn officers not already promised leave should be at their work stations Monday morning.

Rastatter communicated Paz's "all hands" order to Pagan and the other officers in her division on Sunday evening by text message, stating: "Hi, guys. As u all know, we r in a state of emergency with this hurricane. Civilians all have off. No rush, get there when u can, but we r required to be there if u can make it. Thanks." While Pagan and the other officer scheduled for work on Monday, the 29th reported to work, Rastatter did not. She sent a text to Pagan at 9:02 a.m., stating: "Hi. How is it going? Crazy, huh? My kids r home from school, so I'm probably not coming in. Whoever is there, tell them to

keep a low profile, then go home after lunch or so. Unfortunately u should keep ur radio in case stuff crashes."

Pagan did as directed and left the office shortly after lunch, texting Rastatter to advise of his departure. Rastatter responded with a text at 1:35 p.m. stating: "Okay, cool. Hopefully I'll see you tomorrow. Be careful." Pagan testified that Rastatter texted him that evening to report that "[w]ork related phones" and the mobile data terminals in the patrol cars were down. Pagan testified he fielded several calls attempting to address the problem.

Paz testified to the events of Monday evening. His wedding anniversary was that Monday the 29th, and he had advance permission from Acting Chief Diaz to take the day off. After the storm hit, however, Diaz called him to come in. Paz testified he made a 911 call to report electric transmission wires and a transformer on fire on his drive in, and was told the department had already received multiple reports of similar fires from around the City. When he arrived around 8:00 p.m., he learned dispatch could not communicate with the police cars, and although the 911 system was working, non-emergency lines into headquarters were down. The back-up system was permitting headquarters to receive limited calls, but officers were having to use their personal cell phones to call out. He directed an officer to contact Rastatter to

order Pagan, who was responsible for communications and IT issues, to contact dispatch to address the problem.

Deputy Chief Capuana, who testified on behalf of the City, was the captain in charge of detectives in October 2012. He testified he worked Monday, the 29th, as usual. According to Capuana, Chief Diaz pulled him aside in the afternoon to tell him he needed to stay as the storm was coming in. Capuana stayed that evening until after 8:00 p.m. when he was relieved by Captain Guzman. At 11:00 p.m., Capuana was ordered to return at 4:00 a.m. to relieve Deputy Chief Paz, which he did.

Pagan testified that he reported to work as usual on Tuesday, the 30th. Rastatter sent him a text shortly after 9:00 a.m., stating: "How is it going there? Did you make it in? Civilians have off again. . . . If no one bothers you guys, you can leave like yesterday." Pagan testified that Paz came looking for Rastatter at some point on Tuesday. Pagan claimed he told Paz, Rastatter wasn't in. Although Pagan planned to leave early as directed by Rastatter, another supervisor told him to get a car and "[g]et out on the road." He stayed until he was relieved by another officer.

Paz testified he was looking for Rastatter on Tuesday because she was in charge of communications and information technology, and he needed to set

up a mobile command post in the parking lot, which could provide additional phone lines to address the department's communications problems and create a backup system to allow dispatch to communicate with the patrol units. He testified if she had been available to oversee it, he would have been freed up to attend to a myriad of other problems the storm had created.

Paz confirmed Pagan's account that he was in the records division looking for Rastatter on Tuesday. When Pagan told him Rastatter was out, Pagan asked him who approved her leave. Pagan did not answer. Paz testified he approached Chief Diaz about Rastatter's absence on Tuesday, who told him to take it up with her when he saw her on Wednesday.

Pagan testified he reported to work at 8:00 a.m. on Wednesday, the 31st. At 8:19 a.m., he received a text from Rastatter, stating: "Good Morning Ruben. Civilians r in 2day, but I will not be in. Please put me in 4 TC. No sitter. As 4 yesterday, put me down for vacation day [and] present for Monday. Thanks. I'll probably pass by later 2 check up on things." According to Pagan, "TC" stood for "time coming," which was time that officers "accumulate in lieu of overtime pay." He testified he did not complete Rastatter's attendance sheet as requested. Pagan produced his phone records

documenting his texts with Rastatter from Sunday, October 28 through Wednesday, October 31, and they were admitted in evidence.

Paz testified that when Rastatter did not come in on Wednesday, he called her at 11:06 a.m. and asked where she was. Rastatter replied that "she was off." Paz asked who approved her time off, but he did not recall her response. Paz claimed to have told Rastatter, "[i]t wasn't approved. You don't have the approval of the day off, and you are considered AWOL, and you are to report to duty immediately."

When Rastatter reported to his office, Paz confronted her about taking off without authorization during a state of emergency. He testified he explained to her the City was "in distress" due to "power outages and manpower shortages," and that the nine to ten civilians assigned to the records division had returned to work, and were without a supervisor. Paz testified that Rastatter apologized and acknowledged she was wrong to have taken off. When he asked her whether she had taken off Monday as well, Rastatter assured him she was in the office until about 2:00 p.m. Rastatter wrote a report acknowledging she took an unauthorized vacation day on Tuesday, October 30. Paz testified he had not authorized any days off for Rastatter during the storm.

7

Detective Figueroa conducted the internal affairs investigation of Rastatter on behalf of the department. Figueroa testified he telephoned Rastatter on November 13, 2012, two weeks after the storm, and asked her to come to his office with her time records. The records, which were admitted in evidence, indicated Rastatter was marked present for part of the day and on vacation for part the day on Monday, October 29; on vacation on Tuesday, October 30; and present for part of the day and time coming for part of the day on Wednesday, October 31. The video of Rastatter's IA interview was admitted in evidence and relevant portions were screened during Figueroa's testimony.

In the video, Rastatter told Figueroa that she came into the office on Monday around 9:00 a.m. "or so" and left "around 11:30." When Figueroa asked whether she was sure that was accurate, Rastatter responded that she was sure and had told Paz that when he called her in that Wednesday. Rastatter recollected that she "left early, you know, that Monday. I went to the front desk I was like, 'You got any cars for me?' They're like, 'Yeah,' they laughed at me and then I'm like, 'Okay, whatever' and then I went home."

When advised that Pagan had said she was not in the office and that surveillance cameras confirmed it, Rastatter said she "could have sworn I was

8

here on [Monday]. . . . I — I must be mistaken." As for Tuesday, Rastatter claimed she texted Paz Monday night to request Tuesday off, but he never answered her. She explained that she contacted Pagan that Tuesday, who advised her that Paz had been looking for her and that Pagan told Paz that she was on vacation. Rastatter told IA that when she didn't hear from Paz on Tuesday, she "assumed that it was okay since he didn't have a problem with it." Rastatter also told Figueroa that she "didn't know at all that [Paz] said all personnel needed to be [on duty] . . . I don't recall him saying that."

By the time of the hearing, Rastatter's story had changed. She testified that she and Paz had spoken Sunday night, the 28th, and that he had granted her request to take Monday off, saying, "No problem, I'm taking off tomorrow, too." Rastatter claimed her division was not considered an essential service, and that whenever the civilians and City Hall personnel had off, the records division was off too.

Rastatter claimed she "was texting and calling" Paz on Monday evening, the 29th, "updating him on the — on the situation at headquarters, which [she] felt was, you know, very urgent, the phone lines down, the 911 system was down, up until it kind of got rebooted. Nothing was working. It was a

9

complete disaster." She claimed she texted a request to Paz on Monday night requesting Tuesday and Wednesday off, which he granted.

Paz, of course, testified he knew the extent of the communications problems on Monday evening because he had been called in by the chief to deal with them and was present at headquarters from 8:00 p.m. to 4:00 a.m. Tuesday morning. His phone records, admitted in evidence, reflected an exchange of calls with Rastatter on Sunday night, but show no calls or texts from Rastatter's phone number on Monday or Tuesday and only his call to Rastatter on Wednesday morning. Rastatter did not produce phone records to back up the texts she claimed to have sent to Paz or her calls to him. She testified Verizon told her "[t]hey opened up the phone lines [to other carriers] and stopped recording from the 28th, in the p.m., 29th, 30th and 31st."

Rastatter claimed she spoke to Paz by phone Tuesday night. She claimed he told her he had received her texts but had been too busy to respond. Rastatter testified she confirmed with Paz that she had Wednesday the 31st off and that he also told her to put in for a half day on Monday, October 29. Asked why she wrote the report to Paz acknowledging she had taken Tuesday off without authorization, Rastatter claimed that Paz told her Wednesday morning that he was in trouble with Chief Diaz for giving her time off during

the storm. She wrote the report at his request to assist him with his problem with Diaz.

The ALJ closed the record five months after the last witness testified and wrote his decision five months after that. Finding "the facts as stated by [Rastatter's] witnesses were more credible than the facts as stated by [the City's] witnesses," the ALJ found the City failed to prove any of the charges it leveled against Rastatter.

Specifically, the ALJ found Rastatter and the officers and civilians in her division were considered "non-essential" personnel because their work "was limited to purely non-essential administrative functions" and "some technical services for computers and telephones." The ALJ found Paz gave Rastatter Monday, the 29th, off when they spoke by telephone on Sunday evening when he gave her the "all hands" order. He concluded Rastatter, "[a]s non-essential personnel, . . . was less likely to be needed during the state of emergency" than both Chief Diaz and Deputy Chief Paz, both of whom he found were absent from work on Monday, October 29.[1]

---

[1] Although this finding was not addressed by the Commission, the ALJ did not cite the testimony on which he relied in making it, and our own review reveals no support for it in the record. There was no dispute that Paz was not in during the day shift on Monday, but he and Captain Capuana testified to his

The ALJ further found that Rastatter had the authority to allow the non-essential personnel in her division to go home on Monday afternoon.  He found Rastatter telephoned Paz on Monday evening, October 29, and received permission to take Tuesday and Wednesday off.  Regarding Rastatter's statement to both Paz and internal affairs that she had been in the office on Monday, the ALJ conceded it was "questionable that [Rastatter] would be 'mistaken'" about having been in the office instead of "working from home."

---

presence Monday evening.  As to Chief Diaz, Captain Capuana testified that Chief Diaz personally pulled him aside at headquarters on Monday afternoon, October 29, ordering him to remain on duty after the end of his shift at 4:00 p.m.

The only testimony suggesting Diaz and Paz were absent came from two officers who testified on behalf of Rastatter, Lieutenant Sienkiewicz, the officer in charge of the morning patrol shift and Lieutenant Gentile, the officer in charge of the school resource officers.  Sienkiewicz testified that he did not "recall" seeing either Diaz or Paz on Monday, October 29, during his double shift, although acknowledging that Captain Capuana had ordered him out on the road during his second shift.  On cross-examination, Sienkiewicz clarified he had no knowledge as to whether Diaz or Paz were in on Monday, "[he] just didn't see them."  Gentile likewise testified he didn't see either Diaz or Paz on Monday, the 29th.  Gentile also testified, however, that he knew Captain Capuana had a conversation with Chief Diaz Monday, "sometime around . . . 4 or 5:00 at night and my recollection is that they had that conversation in the basement" at headquarters.  Gentile also testified to receiving a call from Deputy Chief Paz on either Saturday, October 27, or Sunday, October 28, advising him that the all school resource officers not already promised leave were expected at headquarters on Monday, even though schools were closed due to the state of emergency.

A-3323-16T4

He found, however, that she made several brief conversations to her staff that day, and "[c]onsidering that [Rastatter's] children were home due to the conditions created by Super Storm Sandy," concluded she "did not engage in inappropriate conduct when she stayed home on Monday."

As to the report Rastatter authored on Wednesday, October 31, stating she "took a vacation day [on Tuesday, October 30] without prior authorization," the ALJ found "'prior authorization' refer[red] to signed time-off request forms and not to prior verbal permission." Regarding Rastatter having marked herself "present" for Monday, the ALJ found the record unclear as to whether Rastatter made that entry before or after her meeting with Paz on Wednesday. He accordingly found "that as to whether [Rastatter] falsified attendance records, the evidence is in equipoise."

The ALJ rejected the charge that Rastatter failed to properly supervise her subordinates by ordering Pagan to falsely complete her attendance sheet, noting "[t]here is no evidence that [Rastatter] was not permitted to retroactively submit time-off requests for verbally received time-off permission. Nor is there any evidence that [Rastatter] was not allowed to work from home when she was not present at work." The ALJ further found no support for the charge of failing to supervise subordinates by releasing them

13

early on Monday because Rastatter's division "was closed during Super Storm Sandy because there was no telephone service or power," and she had the authority to send them home early.

Although the City filed exceptions, the Commission lacked a quorum, and the ALJ's recommended decision was deemed adopted in March 2016 by the Commission pursuant to N.J.S.A. 52:14B-10(c).  The City filed a motion for reconsideration, which after a great deal of procedural maneuvering, including two emergent applications to this court, the Commission finally heard with a quorum in October 2016.  The Commission, although noting the deference ordinarily due to the ALJ who "had the benefit of hearing and seeing the witnesses," found "[i]n this case, the record presents insufficient information for the Commission to decide whether the credibility determinations of the ALJ are supported."  Accordingly, the Commission ordered submission of the transcripts of the OAL hearing for its review.

After its review of those transcripts, the commission rejected the ALJ's decision.  The Commission began its own decision by noting the strict standard for overturning an ALJ's credibility determinations under N.J.S.A. 52:14B-10(c), which prohibits an agency head from rejecting or modifying "any findings of fact as to issues of credibility of lay witness testimony unless it is

first determined from a review of the record that the findings are arbitrary, capricious or unreasonable or are not supported by sufficient, competent, and credible evidence in the record." The Commission had no hesitation in concluding that high standard was clearly met on this record.

The Commission noted the ALJ's only finding on credibility in this intensely disputed case was his statement that Rastatter's witnesses were more credible than the City's witnesses. The Commission found that besides neglecting to make specific findings regarding the credibility of any of the ten witnesses who testified, the ALJ's endorsement of Rastatter's account of events was simply not supported by the record as a whole.

Specifically, the Commission found that Rastatter's testimony that Paz had authorized her three-day absence during Sandy was undermined by her own texts to Pagan, whereas Paz's testimony was corroborated by Pagan and others. The Commission found the ALJ's finding that the officers in Rastatter's division were "non-essential personnel" was rebutted by her text to Pagan relaying Paz's order that "[c]ivilians all have off. . . . [B]ut we r

required to be there."[2] Pagan also testified he was required to be at work as essential personnel.

The Commission noted that if Paz had authorized Rastatter's absence on Monday, October 29, it would not make sense for her to text Pagan Monday morning to say she was "probably not coming in." The Commission also found that Paz's testimony that he had looked for Rastatter on Tuesday was corroborated by Pagan and supported Paz's testimony that he had not authorized Rastatter's time off. The Commission found that had Paz given Rastatter the time off, "he would not have been looking for her."

More significant to the Commission was Rastatter's statement, first to Paz and then to Detective Figueroa in her internal affairs interview, that she had been present at headquarters on Monday, October 29. Rastatter made a very specific statement in that interview, only two weeks after the storm, to the effect that she had stopped at the front desk on her way out to ask if there were any patrol cars available, prompting laughter by the desk staff. When confronted with the surveillance evidence, Rastatter claimed to have been mistaken as to the date. The Commission observed "there was no other

---

[2] We also note that Rastatter did not claim in her internal affairs interview that the officers in her unit were "non-essential." Instead, she claimed she "really did not know that [Paz] wanted everybody in."

relevant day where she came in from approximately 9:00 a.m. to 11:30 a.m. for her to be confused." The Commission found:

> It is clear that Rastatter was caught in an outright lie to the [internal affairs] officer and to Paz, who testified that Rastatter told him she was at work on Monday until 2:00 p.m. Rastatter's contention that she was working from home was an afterthought to cover her lie. Regardless of whether police personnel are allowed to work from home, it is clear that Paz did not authorize it and expected . . . Rastatter and all police personnel to come to work. Moreover, the ALJ found that Rastatter received approval for a vacation day on Monday, October 29, 2012. If that was actually the case, Rastatter's directive to her subordinate officer to mark her present when she had a vacation day would have been inconsistent.

With regard to Rastatter's absence on Tuesday, October 30, the Commission found the ALJ's finding the absence was authorized by Paz was contradicted by Rastatter's own operations report, written the following day, that she had taken a vacation day without his prior authorization. Paz's phone records in evidence did not support Rastatter's assertion that she had telephoned and texted him Monday night, receiving his authorization for time off on Tuesday and Wednesday. The Commission termed Rastatter's explanation for the failure to produce her own phone records, "that her cell phone carrier did not have phone records from 7:00 p.m. Sunday through

17

Wednesday," "convenient," and deemed it not credible "given that other witnesses have text messages and phone records."

The Commission also noted that if Rastatter was sincere in her assertion that records division police personnel were non-essential, "she would not have needed to ask for time off once the state of emergency was declared since non-essential personnel, such as the civilian staff, had been authorized off from work." The Commission found Rastatter had no authority to countermand an order by Deputy Chief Paz that all sworn officers report to work by releasing the officers under her command early Monday afternoon based on her belief that the sworn officers under her command were considered "non-essential."

The Commission further found nothing in the record to support Rastatter's claim "that Paz lied because he did not want to get into trouble" for approving Rastatter's leave request. Rastatter produced no evidence to support her allegation, and the Commission noted no logical reason for Paz to have been "in trouble" as the Chief had excluded officers with pre-approved leave from the "all hands" order. As to the ALJ's finding that the evidence as to whether Rastatter had falsified her attendance record was "in equipoise" because it was not clear whether she made those time entries before or after her meeting with Paz on Wednesday, the record is clear that Rastatter directed

Pagan to make those entries by text at 8:19 a.m., almost three hours before Paz's call to Rastatter at 11:06 ordering her to report to headquarters.

Canvassing the record and making its own findings as permitted by N.J.S.A. 52:14B-10(c), the Commission concluded the City established each of the charges against Rastatter, and that removal was the only appropriate sanction for Rastatter's conduct. Acknowledging its commitment to progressive discipline, the Commission nevertheless noted "that some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record," which the Commission found Rastatter did not have in any event.

Specifically, the Commission found Rastatter's disciplinary history, a ten-day working suspension in 1997, and written reprimands in 2007 and 2012, did "not mitigate her offenses." Moreover, her current infractions were "sufficiently egregious," standing alone, to warrant removal. The Commission found Rastatter

> was not only absent without authorization during a state of emergency, she directed a subordinate officer to submit a false timesheet for her and permitted subordinate officers to leave work while there was an order to report to duty. Rastatter's attempt to cover up her offenses was the most egregious of her actions. The fact that such a supervisory law enforcement officer is guilty of such conduct compounds the

seriousness of the offenses. The Commission emphasizes that a law enforcement officer is held to a higher standard than a civilian public employee. A law enforcement officer is constantly called upon to exercise tact, restraint and good judgment in his or her relationship with the public. . . . The Commission is particularly mindful of this standard when disciplinary action is taken against a high ranking law enforcement officer in a police department. Accordingly, the only proper penalty to be imposed against Rastatter, a Police Lieutenant, is removal.

The Commission denied Rastatter's motion for reconsideration, rejecting her contention that it was statutorily prohibited from making its own factual findings and credibility determinations, and that the Commission's chairperson, Robert M. Czech, had an "undisclosed" conflict requiring his recusal based on his employment as the City's business administrator from 1993 to 1995. The Commission noted that Czech was last employed by the City of Passaic twenty years before, had no knowledge of this case before he entered State service and no relationships incompatible with the discharge of his duties.

Rastatter appeals, raising the following issues:

I. MS. RASTATTER'S 17-MONTH SUSPENSION WITHOUT PAY AND SUBSEQUENT TERMINATION WERE EXCESSIVE AND DISPROPORTIONATE TO THE TWO (2) DISPUTED VACATION DAYS AT ISSUE, AND WERE UNJUSTIFIED BASED ON MS. RASTATTER'S OUTSTANDING AND HISTORIC

CAREER AND SERVICE AS A POLICE OFFICER IN THE CITY OF PASSAIC FOR OVER 20 YEARS.

II. MS. RASTATTER'S 17-MONTH SUSPENSION VIOLATED NEW JERSEY LAW.

III. ALL OF THE DISPOSITIVE ISSUES IN THIS CASE ARE BASED SOLELY ON [THE ALJ]'S DETERMINATION OF THE CREDIBILITY OF WITNESSES, WHICH THE [COMMISSION] IS STATUTORILY PROHIBITED FROM REJECTING BASED UPON ITS REVIEW OF THE PAPER TRANSCRIPT FROM THE TRIAL BELOW.

IV. FORMER CHAIRMAN OF THE [COMMISSION], ROBERT CZECH, HAD A CONFLICT OF INTEREST THAT SHOULD HAVE BEEN DISCLOSED AND WHICH MANDATED HIS DISQUALIFICATION FROM THE [COMMISSION]'S REVIEW OF MS. RASTATTER'S CASE AND WHICH CREATED THE APPEARANCE OF BIAS IN HIS DECISIONS.

Our review of this voluminous record convinces us that none of those arguments is of sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We add only the following.

Although it is rare that an agency head rejects the factual findings of an ALJ based on those findings being arbitrary and capricious or not supported by substantial credible evidence in the record, we are satisfied the Commission did so appropriately in this case, carefully explaining its reasons for finding the ALJ's decision was not supported by the credible evidence in the record.

21

See Cavalieri v. Bd. of Trs. of Pub. Emps. Ret. Sys., 368 N.J. Super. 527, 534 (App. Div. 2004). The ALJ's credibility findings in this matter were virtually non-existent, being limited to the single statement that Rastatter's witnesses were more credible than the City's witnesses. On a record exceeding 2000 pages, encompassing the testimony of ten witnesses testifying about very specific events occurring over the course of three or four days, that finding is inadequate. See State, Dept. of Health v. Tegnazian, 194 N.J. Super. 435, 443-44 (App. Div. 1984). Moreover, the ALJ failed to support key factual findings with reference to the testimony of specific witnesses, leaving them untethered to the evidence in the record.

Although we might ordinarily consider whether the Commission should have remanded the matter to the OAL for more specific findings or a new hearing under these circumstances, see In re Issuance of a Permit by Dept. of Environmental Protection to Ciba-Geigy Corp., 120 N.J. 164, 173 (1990), we are satisfied the Commission acted appropriately in not doing so here. As we have already noted, the record is voluminous, and the events at issue occurred almost eight years ago. The extensive record created by the parties in the OAL permitted the Commission to review the testimony of the witnesses and make its own findings in accordance with the governing statute. Its decision is well-

22

reasoned and reflects its meticulous review of the record. Because that record contains substantial evidence to support the findings on which the Commission based its decision, "[d]eference controls." See In re Herrmann, 192 N.J. 19, 28 (2007).

That same deference extends to the Commission's consideration of the disciplinary sanction imposed. Ibid. Rastatter misapprehends the charges against her by characterizing them as a dispute over two vacation days. The Commission found, based on ample, credible evidence in the record, that Rastatter not only took two unauthorized vacation days, but did so during a state of emergency and contrary to a direct order. Moreover, she lied about her absence to her commanding officer and to internal affairs and directed a subordinate to make a false entry in her time records.

As the Commission noted, "a police officer is a special kind of public employee. . . . and must present an image of personal integrity and dependability in order to have the respect of the public." In re Carter, 191 N.J. 474, 486 (2007) (quoting Twp. of Moorestown v. Armstrong, 89 N.J. Super. 560, 566 (App. Div. 1965)). We are satisfied that the Commission's finding that removal was the only appropriate sanction for Rastatter's conduct was reasonable and deserving of our deference. Id. at 485.

In short, we affirm the Commission's decision, substantially for the reasons set forth in its cogent and comprehensive final agency decision.  <u>See</u> <u>R.</u> 2:11-3(e)(1)(D).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION